The next case for argument, Case No. 23-2403, SWT Global Supply v. U.S. Food & Drug Administration. Mr. Navar? Yes, Your Honor. Good morning, Your Honors, and may it please the Court. Jared Navar for Petitioner, SWT Global Supply. My client is a very small manufacturer in this industry. And this issue or very similar strains of it have been argued and decided in multiple other circuit courts, as you're aware. So, you know, I'll get right to the point of the basis of our arguments. First, on the fair notice requirement. Well, we believe that the FDA's denial of my client's marketing authorization request is arbitrary and capricious for two reasons. The first is fair notice, lack of fair notice. A client like mine doesn't have a lot of arrows in its quiver when it's trying to fight a decision by a federal agency. I want to make clear what this case is not about. We're not here challenging the FDA's or federal agency's traditional and very broad discretion under administrative law to make scientific judgments and decisions based on their expertise. But one of the quivers that somebody like my client does have is very basic, and that's the requirement that derives from due process of having fair notice of the standard that's going to be applied to you when you apply to an agency in a context like this. So my client's applications for marketing were filed in September 2020. The record shows that it wasn't until July 2021 that the FDA all of a sudden denied over 55,000 separate applications for flavored products other than menthol and tobacco. Those decisions have been challenged. My client at the time actually was headquartered in Texas. Our application that was filed in September 2020 had a whole range of products. Some were flavored with non-tobacco, non-menthol flavors, and a subset of those products are menthol flavored. Those are what are at issue in this case, but we already have a stay against the FDA because they earlier denied marketing for the non-menthol flavored products. One of the bases of that decision from the Fifth Circuit was that the FDA had pulled what they called a surprise switcheroo when they announced retroactively a new substantive standard of evidence, which most importantly or most discreetly it can be understood as when the FDA said in July 2021, this is 10 months after the applications were filed, that they were going to reject any application that did not compare the products at issue to tobacco flavored products. Whereas the June 2019 guidance that my client and the rest of the industry relied on gave them affirmatively, gave them discretion to decide which other products to compare their products to in terms of cessation effect, etc. What do you mean by gave them discretion? In the June 2019 guidance, which is in the appendix, I've cited it in our briefing. I'm familiar with where it is. I was asking what do you mean by gave them discretion? I think the best part to look in the guidance is on page 13 and 14 of that PDF, and then also around page 30 to 34 where they specifically say, they specifically tell the industry to, in your application you're supposed to do testing or through bridging analysis through other tests of other products. You're supposed to compare the effectiveness of your products versus other products that are used, that are considered to be interchangeable by consumers. How did that tell your client not to compare with tobacco? The basic problem is, and this is what the Fifth Circuit says in their recent decision in Wages and White Lion, the guidance, if you read it, it affirmatively tells them to make a comparison to other products that are considered to be interchangeable in the market space. There are hundreds and thousands of different flavor profiles for these e-liquids. The problem is the FDA came back later and said, even though we told you you have broad discretion to choose which comparators to use, it could be comparing your apple-flavored products to cherry-flavored products or something, for example. Tobacco was only one of those comparators, but they came back later in July 2021 and said, if you did not compare your products to tobacco-flavored products, then you're not proceeding any further in scientific review. That's the problem. How did the 2019 guidance tell you you didn't have to compare with tobacco? Because it simply didn't say that. It said basically to choose your comparator products. It gave the applicant complete discretion to choose. And the only criteria was, it says, with respect to e-liquids, compare your products in the application to products that are considered to be interchangeable. And so it's based on whatever you, as the applicant, believes a consumer would consider to be interchangeable with an apple flavor, for example. I know my customers come in for apple, and sometimes they might buy cherry. You can make those kind of comparisons. Tobacco was one of the comparators that was on the market at the time, but the 2019 guidance and nowhere in the record did the FDA say before July 2021 that we will not pass your application further in the scientific review process unless you compare to tobacco-flavored products. And that's why, frankly, this retroactive standard of evidence was announced specifically for the reason of clearing the backlog of all these applications. That's what you can, I think, infer from what the record shows here, and that's what the Fifth Circuit basically said in the wages and white line decision earlier this month. But wouldn't you get a fundamentally different set of information if you're going to compare to apple and cherry to tobacco? It sort of seems like a fundamentally different comparison. Well, not really, and this is why it's almost hard to even address this and explain this to the court given the fact that this was announced retroactively. The applications don't train on tobacco as a comparator. For anybody in the industry, everybody's application was denied for the same basis. But clients like mine know that their customers come in for—well, let me say this. One way it's in the record is if you look at the list of products that are in the application, the number of tobacco-flavored varieties is minuscule compared to the hundreds and hundreds of other flavored products that my client submitted, for example. And that's because they know that tobacco-flavored products are not appealing to the vast majority of their customers. So they have hundreds of different—literally, my client has hundreds of different flavor offerings for these liquids available to its clients, and only—I don't even know if it's a dozen or less. There's a very small portion that are tobacco-flavored. So that's why everybody in this industry was whiplashed by the July 2021 decision to say, you don't even get the holistic look about all the risks and benefits of your products. We're not even going to proceed to that that we promised in the 2019 guidance unless you compare it to tobacco-flavored products. And I think my clients—there's survey evidence in the record from our PMTA experts that are in the appendix where all the clients respond to the survey, evidencing that the flavored products help them get away from traditional cigarettes, which is kind of the point here. So that's point number one. And the Fifth Circuit, my client included, got a stay in the Fifth Circuit back over a year and a half ago. Why are you here then? Why did you file this case? Why do you multiply the litigation? Because there were two denial orders, Your Honor. So we had to seek a stay at that time. The statute requires an appeal or a petition for review within 30 days of the denial. At that time, the FDA had not acted on the menthol part of the application, which is at issue here. And so we filed—once the FDA in May 2023 denied the menthol products authorization, we had to file here because by that time their headquarters had moved to this jurisdiction. They're in Missouri now. So the Fifth Circuit's opinion on this case, you know, admittedly there's a circuit split, but the Fifth Circuit fully accepted the argument we're making here in Wages and White Lion as to non-menthol-flavored products. Even before that decision came out, the RJRV case, which is discussed in the briefing, the Fifth Circuit found specifically that's the only circuit decision that deals with a menthol-flavored application, such as here. And they specifically found that the FDA pulled this surprise switcheroo again with respect to menthol. The record is undisputed that these applications were filed— Is that the Eleventh Circuit case? That's another Fifth Circuit case. A stay application only? That was a stay order, yes. Stay order? Yes, Your Honor. And then the conflict there is with the third? It's—well, the only other—and I touch on this in my reply— The Logic Technology case that came in after the briefing, that was on menthol? Correct. Is that right? Correct. So the others are flavored non-menthol cases, as I understand it. That's correct. But there's a conflict between the third and the Fifth Circuit stay order, I guess you could say. That's correct. And since Judge Loken mentioned the Eleventh Circuit, we do rely on the Eleventh Circuit decision for the second part of this argument because the second ground for arbitrary and capriciousness is that the FDA failed to take account of material aspects of the application. Most importantly here, as found by the Eleventh Circuit, the FDA refused to make any acknowledgment of the distinctions in device type with respect to youth appeal. The whole premise of the denial orders here, and in all the denial orders that have been discussed, is the FDA is supposed to make sort of a balancing determination. Is it appropriate for protection of public health, considering the supposed attractiveness to youth of e-cigarette products? But as the Eleventh Circuit found in bitty vapor, and now the Fifth Circuit and wages just agreed with this explicitly, the FDA has refused to acknowledge the material distinction, which they themselves pointed out. Their analysis in the 2020 enforcement guidance goes into great detail, which I've quoted in our opening brief, explaining why the distinction is important. And if you look at the wages decision, which the government filed... Which distinction are you referring to? The device type distinction. So my client makes liquids that are then... Is that separate from your marketing argument? Well, that's separate from the retroactive change in the scientific standard. No, you said the Eleventh Circuit were relying on for the failure to consider marketing plans, and then you switched to the device type. Not so much. In this case, this denial order was issued after the first round of denials. So they did consider the marketing plans here, didn't they? They did read the marketing plans. But what I'm saying is that in considering the marketing plans and the application as a whole, and in balancing the risk to youth appeal versus potential benefit to former smokers, the FDA must make an acknowledgment that the e-liquids for open tank systems that my client makes, which are these huge contraptions that the FDA has previously said are not attractive to youth, are not as high on the risk profile for youth taking them up. But didn't they also... I agree. I think that that was a distinction that was important at one point in the process. But then it came through that the flavor was actually the overarching issue for youth, that they were willing to sort of jump around even within the type of device because of the flavor preference. Well, that's what the FDA has briefed. But thank you for the question. That is critical to the argument here. Because our argument is that if you look closely at what the FDA actually wrote and what the record shows, and this is what Biddy Vapor said in the 11th Circuit, the FDA is conflating different types of sleek, small, easily concealed devices that they found are appealing to youth, the cartridges and disposables. They're saying because youth migrated from cartridges to disposables, which both have the characteristics that appeal to youth, they're conflating that with open tank systems and saying, well, because flavor is the driving motivator for changing from cartridges to disposables, they're trying to conflate that with open tank systems. But the record doesn't show that. And that's what Biddy Vapor said on the pages we cited, in their opinion. And that's also what the Fifth Circuit says in Wages and White Lion. So there's still, and this denial order came out after Biddy Vapor, and the FDA still does not in any way acknowledge that distinction. In other words, there's nothing showing that open tank systems are somehow now materially more attractive to youth. And there is a picture of the, in the Wages and White Lion decision, which is now filed of record, there is a photograph, in that opinion, of the types of devices so the Court can see the distinction here. And I see my time is up. If there's no questions, I thank the Court for the time. Very good. Thank you. Ms. Potty. Good morning, Your Honors, and may it please the Court, Katherine Potty for FDA. I'd like to begin by picking up on the discussion between open and closed systems, and particularly the contention that FDA did not address the differences between these device types in issuing the order here. Beginning on page 51 of the appendix, you can see FDA's discussion of the differences between the device types and its conclusion that the role of flavors in enticing kids persists across different device types. And FDA did consider the difference between these open systems, which are refillable systems, refillable with e-liquids, and closed systems, which are not refillable. They involve disposable products or cartridges. I also want to address the contention that these open systems are always necessarily larger contraptions. I think the amicus brief on page 10 is especially helpful on this point because it includes pictures of some different open system products, one which has an internal reservoir. These are the tank devices that my friend is discussing, and another with refillable cartridges. Both can be refilled with the e-liquid, and both can be concealed in the palm of your hand. But what is extremely important to recognize is FDA has, at different times, seen that particular devices are more popular with youth, and if those different devices are not available in the flavors that the kids want, they will migrate in large numbers to other devices that do have those flavors. So it is really the persistence of flavor that is driving the appeal here. I also do want to pick up on the discussion about the requirement that Petitioner compare its flavored products to tobacco-flavored products. As the Ninth Circuit recently observed, the Ninth Circuit, the Second, Third, Fourth, Seventh, and D.C. circuits have all rejected that argument. They say, first, that the Tobacco Control Act expressly requires the type of comparison that Petitioner takes issue with here, and they also explain that a comparison with tobacco-flavored products, which offers the same type of health benefits to existing smokers, but poses a much reduced risk of enticing children, is just a natural part of the risk-benefit analysis that the Tobacco Control Act requires. So if the Supreme Court granted cert in wages and affirmed, would that control this case? It does truly depend on the nature of the analysis there. So one issue, for example, that came up. Affirmed for the reasons stated. So the marketing plan issue, for example, is one of the- What would be left in this case if that happened? Everything, Your Honor, in this case. If the Supreme Court affirmed on the marketing plan issue, because FDA did expressly consider the marketing plan here, and so there are discrete issues that the Supreme Court might address in wages were it to grant cert. But that wasn't the only basis for the wages decision. No, Your Honor, there were other bases. I'm talking about our task in moving forward. So if the Supreme Court were to affirm for the reasons stated in all 60 pages of the Fifth Circuit majority, would that control this case? There are also differences between the evidence submitted in that case and this one. So you don't have a position? You don't have an answer for me? I do, Your Honor, but it's that it could go either way depending on the nature of the Fifth Circuit decision. If the only thing that the Supreme Court says, excuse me, of the Supreme Court's decision, if the only thing it says is that we affirm for the reasons stated in the en banc opinion, then I think there's still plenty of work to be done here, because there are material differences between that case and this case, including the nature of the evidence submitted here in the application. And a big part of the... Basically, the bottom line, according to the Fifth Circuit, is your client was arbitrary and capricious in denying, what, 950,000 applications for whatever. So it seems to me that how would menthol... It strikes me from a reliance standpoint that the menthol applicants were more lured in than the flavored, as I understand the cycle. So it would seem to me that that would... If your client was arbitrary and capricious with the flavored applicants for the reasons stated, it seems to me that would be controlling. And you don't have to answer that. It's just a problem for us to ponder. I am very happy to answer that, Your Honor. And part of the issue is that the Fifth Circuit said in its en banc opinion that the petitioners there submitted the evidence that FDA said was required in the 2019 guidance. That is not the case here. The sort of evidence that was submitted in these applications is truly extremely weak. Summaries of one-time surveys with very little information about the sampling methods, the strength of the study results, the sampling designs and techniques, and the analytical methodology here. The one study that does have information about the sample reveals that there are 30 respondents solicited from petitioners' Facebook contacts and direct email contacts who filled out a Google form. That is just not the sort of robust and reliable evidence that FDA has repeatedly considered. So while the en banc court in the Fifth Circuit did say that those petitioners had submitted the application information that FDA had previously said was required, and we do dispute that, that is not at all controlled in here given the quality of the scientific information that was submitted with the application here. Could you speak a little more directly into the microphone? I heard all of that, but it's a little bit hard. Yes, Your Honor. That's even better if you move it down a little bit and speak right into it. Thank you. Great. Do you want to address the argument that the menthol applicants are different from the flavored applicants and that the previous guidance allegedly may have led an applicant to think that menthol was treated differently than flavors? Absolutely, Your Honor. So FDA did take more time to consider the menthol applications because it wanted to see if there were factors unique to menthol that would affect the public health assessment. So this included in part the understanding that menthol combustible cigarettes are on the market, unlike combustible cigarettes in other flavors like cotton candy, and that was one difference with menthol. And then another was whether menthol would be as popular with kids as some of these other flavors. With respect to the first, FDA has found that there is not consistent evidence showing that menthol-flavored e-cigarettes are more effective than tobacco-flavored ones, even among this population of... As to adults or as to future? As to existing adult smokers who smoke combustible cigarettes, there was an idea that the population of smokers who prefer the menthol cigarettes might be more helped by menthol-flavored e-cigarettes specifically because of that similarity. You don't. Half of the equation. Right. And FDA found that the evidence does not show that. Because there was no longitudinal study or what? Because there has to be robust evidence showing this difference. How many years would that take? So a longitudinal study can go over years. FDA has also explained that an actual use study over a period of six weeks could support an application. And FDA itself defines long-term studies to be six months, so it doesn't have to be six months. It could be as short as six weeks if you do show a significant reduction in cigarettes per day. But there's just not evidence showing that menthol e-cigarettes are actually more helpful in this respect. My question was more whether you want to address the argument that the FDA had said something different earlier about menthol, even if you're right about the current evidence that there was not adequate notice. Thank you, Your Honor. FDA did not say something different earlier about menthol. It prioritized enforcement of the products it understood at the time to be most popular with kids. And as we were discussing earlier, that did involve focusing on particular device types that were most popular with kids or particular flavors that were understood to be more popular with kids. But the decision to prioritize enforcement certainly does not preclude FDA from determining that these other products are themselves not appropriate for the protection of the public health. And this is a point that the Fourth Circuit made in a veil of paper discussing the implications of that prior enforcement prioritization and just how it does not follow that FDA now cannot act on these other products, especially because FDA has found that kids use menthol-flavored e-cigarettes at very similar rates to the mint-flavored ones or the candy and dessert-flavored ones that FDA has found to be very risky to kids. And I do want to emphasize that the addition of these non-tobacco flavors really can have devastating public health consequences because the addition of the flavors makes these products much more palatable for kids. And there's also evidence that the flavors influence the reinforcing and rewarding effects of the nicotine hit and so can, I guess, increase the odds of addiction to nicotine as a result. Judge Loken asked about a cert petition in the Fifth Circuit case. Is there one filed already? No, Your Honor. The time for filing one has not yet run. Most of 90 days now, I think. Sorry? You've got either 60 or 90 days. 90 days, Your Honor. So there may be one filed soon. There might be, Your Honor. I will say there have been prior cert petitions filed concerning other decisions of the Fourth and Seventh Circuits concerning these flavored e-cigarettes, and those have been denied by the Supreme Court. If there are no further questions, Your Honors, we ask this Court to deny the petition. Well, I would, on the cert process, I have rarely read a case in which a circuit court aggressively created a conflict, acknowledged and created, basically said, if cert is applied for, how can you not take this? So now your agency hasn't lost one before, particularly. No, Your Honor, we had not. And the Fifth Circuit did expressly note its disagreement with these other Courts of Appeals, the Second, Third, Fourth, Seventh, Ninth, and D.C. Circuits. What do you say about, assuming for the sake of analysis that the petitioner does prevail on any of these claims, what would be the follow-up procedure? A remand back to the agency, Your Honor, which is the ordinary remedy authorized by the agency. And what could the agency do then if the Court, like in the Fifth Circuit case, said that you didn't give adequate notice or you switched your position or whatnot? What could the agency do next? So it really would depend on the nature of the error as found by this Court. And so there are a number of elements to the arguments here. And so depending on which problem- Well, let's take the Fifth Circuit approach. Let's say the notice point, which is what was argued this morning, prevailed. What could the agency do to cure that? So the agency could perhaps give an opportunity to- New guidance? Go ahead. Give an opportunity to submit additional information. And I will say that that opportunity remains open to a petitioner in any event, because resubmissions are allowed, and that is under Section 1114.17 of the regulation. I see. They could say, we'll give you a new opportunity to make a showing about comparison with tobacco products, tobacco flavors. That's true, Your Honor. And as you mentioned, there are other options that FDA could take in response, which is why it is important to simply remand and not go any further, because the agency does have discretion in responding, consistent, of course, with this Court's order. All predicated, of course, on a finding that the agency acted arbitrarily and capriciously here, which has been squarely rejected by almost all of the circuits. And as you recognized, also, a published opinion with respect to menthol, specifically in the Third Circuit logic decision last October. Are there no further questions? Thank you, Your Honor. I'll give you a minute for rebuttal. Okay. Thank you, Your Honor. I was going to ask, because I know I went past my time earlier. So just briefly, to take the last question first, if a remand to the agency were to occur, the simplest way it could be handled is simply allow my client to address in its application the question that the FDA now says they want answered, the specific comparison to tobacco-flavored products. She just said that you could make a resubmission at any time. Well, that's true. Why not do that instead of litigate? Well, it's true in a sense, and this is cited in the Fifth Circuit's opinion. The FDA has said in its guidance materials it is not obligated to review an unsolicited amendment to an application. That's quoted from the guidance materials in the wages opinion from the Fifth Circuit. Not obligated to, but it may. Right. They could if they want, but they're not obligated to. We've been appealing against this decision for, I mean, since the Fifth Circuit application was filed. Bob, I just wondered, as a matter of strategy, if the company is in stress because they can't market these things, why not just submit it if you've got the data? Apparently you don't have the information that you think would work. Well, no, that's not true at all. It's not true. Well, why not submit it then rather than take a year and a half to litigate? Well, one reason could be that because if we were to do that, the FDA may show up here at this argument or in their briefs and say, well, look, they've acknowledged by submitting additional information that there's something wrong with their initial application. You could put a cover letter that says, we're not acknowledging there's anything wrong with our position, but we just want a quick approval. Well, we could have, but that's not the FDA. Again, the FDA, there's no guarantee that they're going to look at it. And before my client spends money trying to burnish the application to meet a standard that they didn't understand to begin with. Okay, I understand. I'm just wondering. So I know my time is up, but since I responded to the question, if I can just hit some very quick points. My opposing counsel's first point where she put. . . No, your time is up. Okay. Well, then. . . The case has been thoroughly briefed and argued, and argument's been very helpful. Okay. We'll take it under advisement. Well, thank you, Your Honors.